| .GOTHARD, JUDGE.
Defendant, Kenney Sumling, appeals his conviction and sentence on one count of forgery in violation of LSA-R.S. 14:72. For reasons that follow, we reverse.
The record shows that the Jefferson Parish District Attorney filed a six-count bill of information charging Kenney Suml-ing and a co-defendant, Robert Johnson, with violations of the forgery statute, LSA-R.S. 14:72. Counts 1, 3 and 5 alleged that defendant and Johnson forged checks with intent to defraud. The remaining counts alleged that defendant and Johnson “issued and transferred” checks.
Defendant was arraigned on July 30, 1999, and pled not guilty. On March 16, 2000, defendant was tried by a six-member jury only on Count 31 sof the bill. On that day, the jury returned a verdict of guilty as charged. The state dismissed all charges against Robert Johnson on August 16,1999.
Defendant filed a Motion for New Trial on March 23, 2000, alleging he had uncovered alibi witnesses since the time of trial, and that photographic evidence improperly withheld from him prior to trial would have exonerated him. The motion was heard on March 31 and April 28, 2000. On the latter date, the trial court denied the motion.
On July 14, 2000, the trial court sentenced defendant to five years at hard labor. Counsel made an oral motion to reconsider sentence, renewing a previously filed written motion. The trial court denied the motion that day.

FACTS

Janet Pontiff, the office manager for Wells Construction Company in Kenner, testified that in June, 1998, she was reconciling that month’s bank statement from Hibernia National Bank when she discovered several unauthorized checks written on a company account. Ms. Pontiff testified that only she and the company’s owner, William I. Wells, Jr., were authorized to write checks on that account. One of the checks in question was made payable to “Kenny Sumling,”[1] and was signed by John Wells, Jr. Ms. Pontiff, who was in charge of the company’s payroll and bank accounts, testified that no one named Sumling had been employed with the company in the fifteen years she had worked there. She verified this by checking the payroll records. She asked the project manager whether he had ever hired someone named Sumling, and he responded that he had not. Other bad checks were made out to Roy Johnson and Robert Johnson, and were also Rsigned by John Wells, Jr. She determined that one of the Johnsons had worked for the company through a temporary agency, but stated that temporary workers were paid by their agencies, and would not have received payroll checks from Wells Construction.
Ms. Pontiff stated that no one named John Wells, Jr. worked with the company. Moreover, the checks were written on account “A”, the account used to pay the company’s bills. The payroll account was account “B”. The checks had come from a new book, which was stored under a desk in her office. Only she, the company’s owner, and his wife had access to the checks. Ms. Pontiff surmised that the checks had been taken from her office some time earlier, but stated there had been no evidence of a break-in.
*846 Ms. Pontiff testified that the fraudulent checks were all made out for roughly the same amounts. According to Detective Michael Cunningham of the Kenner Police Department, the stolen checks were numbered in sequential order. The detective further testified that these checks were all cashed within the space of an hour on May 18,1998, at the Driftwood branch of Hibernia National Bank on Williams Boulevard in Kenner.
Christy St. Germain, a Hibernia Bank teller, testified that she recognized her handwriting on the back of State’s Exhibit 1, the Wells Construction check made out to Kenny Sumling in the amount of $468.99. Although she had no independent recollection of the transaction, Ms. St. Ger-main stated that prior to cashing the check, she would have followed standard bank procedure by comparing the payee’s signature with the state identification card he presented to her. In this instance she found the signatures to be a match, as evidenced by the fact that she wrote the payee’s ^identification number on the back of the check, along with the letters “PSM” (picture and signature match). Ms. St. Germain stated that if anyone other than the payee on the check had attempted to cash it, she would have prevented that person from doing so.
Detective Cunningham testified that he used the identification number written on the back of the check to obtain a photocopy of defendant’s identification card from the Louisiana Department of Motor Vehicles. He was also able to locate Robert Johnson in that manner. The detective testified that the third suspect, Roy Johnson, was still at large at the time of trial. On July 9, 1998, Cunningham questioned Robert Johnson about the forged checks, and Johnson denied any connection with them. Johnson did say, however, that he knew Roy Johnson and defendant, Kenney Sumling, from the neighborhood in which they all live.
Handwriting exemplars were obtained from both defendant and Johnson. Detective Keith Bourque, a handwriting expert with the Jefferson Parish Sheriffs Office, testified that Johnson’s writing did not match the signatures on the checks he was alleged to have forged. Because of that finding, charges against Johnson were subsequently dropped.
After questioning Johnson, Cunningham located defendant at his residence on Newton Street. The detective asked defendant to accompany him to the Kenner Police Department for questioning, explaining that he was a suspect in a forgery.[2] Defendant went willingly. According to Cunningham, he advised defendant of his Miranda rights after they arrived ¡ ñat the station. Defendant signed an Advice of Rights form, indicating he understood his rights. Defendant waived those rights, and agreed to be interviewed.
Defendant denied having cashed any Wells Construction checks. He told the detective he had never been inside Hibernia Bank, and professed not to know what the detective was talking about. The officer asked defendant for a piece of identification. Defendant responded that he had left it at his girlfriend’s house. He later said that his driver’s license had been confiscated by a police officer during a traffic stop.
During his trial testimony, defendant stated that he had obtained a state identification card years earlier, when his driver’s license was revoked. Defendant further testified that he had lost several identification cards. He stated that he did not have a card at the time of the incident, and that *847 he was using his birth certificate and Social Security card as identification.
Detective Cunningham testified that he obtained videotape taken by the bank’s surveillance camera at the time the forged check was cashed. The detective noted that defendant was wearing a cap in the videotape that bore a strong resemblance to the hat he wore during his interview at the police station. The cap was admitted into evidence at trial. The court also admitted, over defense counsel’s objection, a slowed-down version of the bank surveillance tape.[3]
During his trial testimony, defendant admitted he had prior convictions in Jefferson Parish for simple robbery and battery on a police |7officer. He was still on probation for those convictions at the time of trial, although his probation had not as yet been revoked. Defendant further testified that he was innocent of the charged offense. He stated he has not been inside a bank in eight years, as his fiancee, Mamie Hunt, does his banking for him. Defendant testified that he does not know how someone used his identification card to cash a check. He admitted that he had never reported the card lost.
Detective Cunningham testified that he obtained a handwriting sample from defendant at the police station, and that he passed the sample on to the district attorney’s office.
However, Detective Bourque, who is a handwriting expert, testified he received only a photocopy of defendant’s handwriting exemplar, rather than the original. Bourque stated that he cannot do a handwriting comparison using a photocopy, as it does not allow him to examine such factors as pressure and pen lifts.
Detective Cunningham obtained an arrest warrant for defendant on July 15, 1998. He placed defendant under arrest two days later.

ANALYSIS

In two of the errors assigned, defendant challenges the sufficiency of the evidence used to convict him of forgery.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a | ^reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223 (La.App. 5 Cir. 6/30/99), 742 So.2d 604.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Williams, supra. When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438.
The Louisiana Supreme Court has recently stated:
On appeal, the reviewing court “does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.” State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020. *848 Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a. rational juror could not have found proof of guilt beyond a reasonable doubt. Id.
State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, cert, denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Rogers, 99-1378 (La. App. 5 Cir. 11/28/00), 772 So.2d 960.
|3When issues are raised on appeal both as to sufficiency of evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issues regarding trial errors become moot. State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 978; State v. Hearold, 603 So.2d 731, 734 (La.1992).
The forgery statute, LSA-R.S. 14:72, defines two types of acts which constitute a violation of the statute as follows:
Forgery is the false making or altering, with intent to defraud, of any signature to, or any part of, any writing purporting to have legal efficacy.
Issuing or transferring, with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute forgery.
An essential ingredient to the crime of forgery is the specific intent to defraud. State v. Wade, 375 So.2d 97 (La. 1979), cert, denied, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 249 (1980); State v. Jackson, 258 La. 632, 247 So.2d 558 (1971); State v. Durham, 32-154 (La.App. 2 Cir. 8/20/99), 748 So.2d 1, 9, unit denied, 99-2959 (La.4/7/00), 759 So.2d 91. Specific intent may be inferred from the circumstances and actions of the defendant. State v. Cepnano, 00-213 (La.App. 5 Cir. 8/29/00), 767 So.2d 893, 898.
Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the state is required to negate any reasonable | ^probability of misidentification in order to carry its burden of proof. State v. Zeno, 99-69 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, 706.
The state tried defendant only as to Count 3 of the bill of information, which alleged that defendant “did wilfully and unlawfully forge with intent to defraud a check drawn on the account of Wells Construction Co. at Hibernia National Bank dated May 18, 1998, in the sum of $468.99 payable to' the order of Kenny Sumling and signed John Wells, Jr. as purported maker thereof ... ”.
The state’s case against defendant was essentially circumstantial. Ms. Pontiff of Wells Construction Company testified that she discovered checks missing from a new checkbook she kept under a desk in her office, and that no one but herself, William Wells, and Wells’ wife had access to the company checkbooks. She could give no explanation for the disappearance of the missing checks. Nor was there any evi *849 dence that the company offices had been burglarized. Ms. Pontiffs testimony did not connect defendant to Wells Construction, or to the check at issue. In fact, she testified that an investigation on her part revealed he had never been employed by the company. She did discover, however, that Roy or Robert Johnson, whose names appeared on some of the stolen checks, had at one time been employed as temporary help at the company. The only evidence linking defendant to Robert and Roy Johnson was the hearsay testimony of Detective Cunningham, who said Robert Johnson professed to know defendant from “the neighborhood”. Defendant himself testified that he did not know them.
No eyewitnesses testified to having seen defendant take the check from Ms. Pontiffs office. There was no testimony that anyone saw defendant fill hi out the check. Most importantly, there was no expert testimony to show that defendant’s handwriting matched the handwriting on the forged check.
Detective Cunningham testified he obtained a handwriting sample from defendant and turned it over to the district attorney’s office, but did not know what happened to the sample after that. Detective Bourque, the handwriting expert called as a defense witness at trial, testified that he received only a photocopy of defendant’s handwriting exemplar. He could not use the copy to do a handwriting comparison. He requires an original sample in order to study the pen lifts and pressure. Thus, there was no testimony to show that defendant’s handwriting is consistent with the signature on the check.
Ms. St. Germain, who cashed the check made out to Kenny Sumling, did not have any independent recollection of the inei-dent. She testified that the notations she made on the check indicated she had checked the customer’s photo identification card, and that the signatures on the photo identification and the check matched. However, we find it significant that despite Ms. St. Germain’s testimony, she failed to notice that the identification card reflects the correct spelling of the defendant’s name, “Kenney Sumling”; and the forged check is issued to “Kenny Sumling”. Further, the endorsement on the back side of the check is “Kenny Sumbling”, a misspelling of both the first and the last names.
The date and time the check was negotiated are also stamped on the back of the check. It is noted that the state failed to produce the actual identification card defendant was purported to have used when cashing the |12check.[4] A photocopy of defendant’s identification card, which Detective Cunningham obtained from the Louisiana Department of Motor Vehicles, was entered into evidence instead.
An examination of the check defendant was alleged to have forged shows that his first name was spelled “Kenny” on the front, and was endorsed “Kenny Sum-bling” on the back. However, the photocopy of defendant’s state identification card shows his name is printed and signed as “Kenney Sumling”. Even a cursory examination of the endorsement on the check shows it obviously does not match the name on the copy of defendant’s state identification card. The two are not even spelled the same, as the last name on the endorsement is spelled “Sumbling”. These facts would seem to call into question Ms. St. Germain’s testimony that the signature on the identification card presented to her matched the one on the check.
*850 It may be inferred that defendant was not the person who made the forged check. Roy Johnson, the suspect who was still at large at the time of trial, could theoretically have made the checks. The check might also have been made by some unknown person. We do not find the evidence presented excluded every reasonable hypothesis of innocence as required by LSA-R.S. 15:438.
Defendant is correct in his assertion that the state produced no direct evidence, and very little circumstantial evidence, that defendant himself made or altered the instrument, as contemplated by the first section of LSA-R.S. 14:72.
| ^Further, we find that the state produced insufficient evidence to prove defendant transferred the forged check, as prohibited by the second part of the forgery statute. There was no eyewitness to identify defendant as the person who cashed the check at Hibernia. However, there was a video surveillance tape from the bank, showing an African American man performing a transaction. Ado Ball, a fraud investigator with Hibernia, identified the tape and testified that he provided the surveillance tape to the Kenner Police Department. The original tape plays only in fast motion. Mr. Ball testified on cross-examination that his department possesses equipment that allows surveillance tapes to be played at a lower speed. The state produced a slowed-down version of the videotape, which was played for the jury twice.
It is possible to infer the man was cashing the Wells Construction check, since the time marked on the videotape coincides with the stamp on the check, indicating the time and date it was cashed. However, the surveillance tape is not clear enough to identify the man in the tape as the defendant with certainty. The only other evidence was a dark cap defendant was wearing at the time of his arrest, and the fact that the man who was in the bank was wearing a dark cap.
The jurors were shown photocopies of Robert and Roy Johnson’s state identification cards, and had the opportunity to make comparisons between the photographs of those men and the man in the videotape. The jurors, after viewing a slowed-down version of the tape, apparently believed defendant was the man in the bank. However, we have reviewed both the original, which is high speed, and the slowed-down version of the videotape, luwhich is blurred and grainy. It is impossible, in our view, to make any certain identification from either tape. We do not believe that the jurors, even viewing the tape twice, could make out the face of the man pictured at the bank counter. The man in the video could easily have been someone other than defendant.
Given the lack of direct evidence and the tenuous circumstantial evidence, including the identification evidence, we find the evidence was insufficient to prove defendant’s guilt under the Jackson criteria. Accordingly, we reverse defendant’s conviction and sentence.
REVERSED.

. Defendant's first name is correctly spelled "Kenney.”

. Defendant testified that he was not informed of the nature of the investigation.

. The prosecutor deemed the original version of the tape too fast for the jury to be able to view it properly.

. Both defendant and his fiancee, Mamie Hunt, testified that defendant had lost the card some time in 1997 or 1998.